Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JOHN DOE, individually, and MARY DOE, on behalf of JANE SMITH, a minor,<br><br>                Plaintiffs,<br><br>vs.<br><br>ANTHEM BLUE CROSS, and the MARKLOGIC CORPORATION BENEFITS PLAN.<br><br>                Defendants. | COMPLAINT<br><br>Case Number 2:20-cv-00059 DBP |

Plaintiffs John Doe ("John"), individually, and Mary Doe ("Mary"), on behalf of Jane Smith ("Jane"), a minor, each of whom are designated by pseudonyms, through their undersigned counsel, complain and allege against Defendants Anthem Blue Cross ("Anthem") and the MarkLogic Corporation Benefits Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. John, Mary, and Jane are natural persons residing in Fairfax County, Virginia.

1

2. John is Jane's stepfather and is a participant in the Plan. Mary is Jane's mother, is a beneficiary of the Plan, and has parental rights to act on Jane's behalf. Jane is a beneficiary of the Plan.

3. Anthem is the trade name of Blue Cross of California, an independent licensee of the nationwide Blue Cross Association. Anthem acted as third-party claims administrator for the Plan during the treatment at issue in this case.

4. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). John was a participant in the Plan and Jane was a beneficiary of the Plan at all relevant times.

5. Jane received medical care and treatment at Uinta Academy ("Uinta") beginning on July 3, 2018. Uinta is a licensed residential treatment facility located in Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

6. Anthem denied claims for payment of Jane's medical expenses in connection with her treatment at Uinta. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Mary and John for the medical expenses they have incurred and paid for Jane's treatment.

7. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah, and the treatment at issue took place in Utah. Finally, in light of the

sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Jane's Developmental History and Medical Background

10. From a very young age, Jane had difficulty adapting to changes, she would often become frustrated and have a hard time calming down. Jane was a very athletic child and often participated in competitions. She also did very well academically and in music. While Jane seemed to be able to make new friends easily, she had difficulty maintaining friendships and often reported that she felt different and didn't fit in with the others.

11. When Jane started middle school, she was placed in an advanced academic program, however she reported being bullied and not having very many close friends. Around the time that she was in seventh grade, Jane's grades began to drop and she started skipping class and swim practice. Jane became increasingly withdrawn. Jane also exhibited troubling behaviors such as such as reckless social interactions, poor judgement, unusual and overly intense ideas and feelings about people, suspiciousness and uneasiness with others, changes in sleep patterns (insomnia), and changes in self-care and dress attire (at times not caring for her appearance and at others dressing in uncharacteristic ways).

12. Jane continued to be bullied as she started high school. On one occasion in October of 2017, Jane became very agitated and was unable to calm herself down. She also started behaving in an intimidating and threatening manner. This went on for more than a day and reached the point where Jane was hospitalized. At the hospital, Jane expressed suicidal ideation and it was discovered that she had been self-harming and frequently taking medication to help her sleep.

13. Jane's behavior continued to deteriorate after her month-long hospitalization. Jane's family history included Bipolar disorder with psychotic features and Jane began to show evidence of this as well, including having hallucinations. Jane disclosed that she had been experiencing these hallucinations since about the age of six. Jane was placed on medications which initially seemed to help.

14. On the advice of Jane's treating providers at the hospital, Jane was transferred to a new school and began receiving therapy at least once a week as well as an individualized education plan. Despite these interventions however, Jane continued to be withdrawn, suffered from high levels of anxiety, and continued to struggle in social situations. In December of 2017, Jane was again hospitalized on the advice of her psychiatrist Mary Schumann, following an episode where Jane became very agitated and aggressive. Jane continued to report suicidal ideation and that she was having command hallucinations with negative and distressing content.

15. In February of 2018, Jane stated that she was having night terrors and she reported her first visual hallucinations. Jane continued to struggle with significant depression and was officially diagnosed with Bipolar I disorder with psychotic features. Jane's testing

psychologist, Debra Brosius, PsyD. expressed concern over Jane's situation and stated in part:

> [Jane] is a high-risk adolescent. Continued, consistent monitoring of her safety, paranoid ideation, skewed perceptions and her mood dysregulation is warranted. Should there be changes in her mental status, an IOP program or inpatient hospitalization may be warranted.

16. Jane continued to struggle while at school and withdrew from her classes as well as socially. Jane also started expressing paranoid ideation about school staff and her fellow students. The principal expressed concern with Jane's ability to continue attending school. After a meeting with her psychiatrist when her medications were increased, Jane attempted to overdose on her lithium tablets and was again hospitalized. After she was medically stabilized, Jane spent one week in the acute inpatient setting, after which she was placed in a partial hospitalization program.

17. After only two weeks in partial hospitalization, Jane was again hospitalized due to increased suicidal ideation, paranoia, self-harm, as well as auditory, visual, and tactile hallucinations such as feeling as if she were being "skinned alive." Jane continued to exhibit troubling behaviors while hospitalized such as refusing to eat, or making a noose out of her bedsheets and trying to suffocate herself. Jane's treatment team recommended that she receive residential treatment care.

**Uinta**

18. Jane was discharged from Dominion Hospital on July 2, 2018. The hospital treatment team recommended that Jane be transferred to a residential treatment center following her hospitalization. In a letter dated August 20, 2018, licensed clinical psychologist Mary Schumann Ph.D. wrote in part:

> …I know that I personally, despite having over 20 years of experience in therapeutic work, could not adequately help [Jane]. In addition, she seemed to become more disorganized and depressed while in Dominion Hospital. [Jane] is a bright young woman with much potential. I believe that the therapeutic model conducted at Uinta Academy in Utah is highly beneficial as she is in an environment where there is constant monitoring and response to the difficult behaviors and thoughts [Jane] struggles with. …

19. Jane was admitted to Uinta on July 3, 2018.

20. In a series of Explanation of Benefits ("EOB") Statements, Anthem denied payment for Jane's treatment. The EOB's gave the following justifications for the denial:

    > 545 – YOUR PLAN PROVIDES THAT NO BENEFITS ARE PROVIDED FOR SERVICES DETERMINED NOT TO BE MEDICALLY APPROPRIATE OR MEDICALLY NECESSARY. THIS AMOUNT HAS BEEN DETERMINED AS NOT ALLOWED BECAUSE CLINICAL REVIEW OF THE SERVICE HAS DETERMINED THAT IT WAS NOT MEDICALLY APPROPRIATE OR MEDICALLY NECESSARY.
    >
    > 001 – THIS IS NOT A COVERED EXPENSE OF THE PATIENT'S PLAN
    > 009 – ADDITIONAL INFORMATION HAS BEEN REQUESTED REGARDING THIS CLAIM. ONCE RECEIVED, THIS CLAIM WILL BE REOPENED AND BENEFITS WILL BE DETERMINED.

21. In addition, Mary was sent denial letters dated September 14, 2018, November 29, 2018, and January 28, 2019, which gave the following justification for the denial:

    > The above noted service(s) is not a benefit covered under your health plan contract. As stated in your Member Benefit Agreement in the DEFINITIONS and under the section titled Residential treatment center it states The facility must be fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA). Wilderness programs are not considered residential treatment centers. UINTA ACADEMY is not accredited by any of the regulatory agencies, therefore the authorization request for Residential Treatment Center level of care is/are excluded from coverage.

22. On February 13, 2019, Mary submitted an appeal of the denial of Jane's treatment at Uinta. She expressed alarm that Anthem claimed to have not received Jane's medical records, yet one of the reasons that it purported to deny care was because it deemed her

care to not have been medically necessary. She questioned how Anthem could have come to this conclusion and given a full and fair review of Jane's claim without reviewing the appropriate medical records.

23. Mary argued that Jane's treatment continued to be medically necessary and was needed to treat her symptoms of psychosis, depression, mania, paranoia, self-harm, and suicidal ideation. Mary contended that Jane's treatment was a covered benefit under the terms of the Plan.

24. Mary asserted that Anthem had not complied with its obligations under ERISA and had not, for instance, disclosed the names and qualifications of its reviewers, reviewed Jane's medical records before it determined it would deny payment, or given her a clear and concise reason for the denial. Mary pointed out that she had received numerous documents with separate justifications for denying care.

25. Mary also contended that Anthem's denials were in violation of MHPAEA which required it to offer mental health benefits "at parity with comparable medical or surgical benefits." She argued that because the Plan offered coverage for intermediate level medical treatment such as skilled nursing facilities, it's denial of payment for Jane's treatment likely violated MHPAEA and constituted a non-quantitative treatment limitation.

26. She wrote that "[a]s such, in order for Anthem to require that Uinta be fully accredited to meet their definition of an RTC, Anthem would also need to require SNFs [skilled nursing facilities] to be fully accredited, *which they do not*." (emphasis in original) Mary requested that Anthem explain to her why it placed more restrictive requirements on residential treatment than on skilled nursing care.

27. Mary recounted Jane's history up to that point, including Jane's suicidal and paranoid ideations, self-injurious behaviors, and auditory and visual hallucinations. Mary included a copy of Jane's medical records with the appeal as well as letters of medical necessity from Jane's treatment team which recommended that Jane receive care in a residential treatment center.

28. Mary wrote that while the family was initially opposed to residential treatment and would have preferred to attempt a less intensive level of care, the family decided that Jane needed residential treatment after listening to the recommendations of Jane's treatment team, who recommended intervention before Jane's situation deteriorated even further.

29. Mary wrote that she had contacted Anthem, whose representative agreed that Jane was in need of residential treatment care. She wrote that she encountered several obstacles which made it difficult to find an adequate facility. She wrote

- Most programs available that would meet her needs and required level of care were medical/behavioral programs.
- Most non-medical programs explored did not accept patients with psychotic symptoms specially [sic] that were not in full remission. [Jane] was discharged with a diagnosis of Schizoaffective Disorder.
- RTC's that were not medical level one facilities did not accept individuals with such a recent and lethal suicide attempt.

30. Mary wrote that she directly spoke with over 50 different facilities in the month of June alone. She stated that of all the residential treatment facilities that she was able to evaluate, Uinta was the only facility that could provide the care that Jane needed while also keeping her safe.

31. She wrote that the severity of Jane's diagnosis – which had been updated to Schizoaffective Disorder, bipolar type – combined with Jane's functional deterioration, showed that residential treatment was the appropriate level of care to treat Jane's

symptomology, and that early intervention was crucial, was the generally accepted standard to treat early psychosis, and was necessary to get Jane's mental health problems under control.

32. Mary included a journal article which highly encouraged early intervention in cases involving psychosis and stated in part that, "The first one to two years of illness are where the greatest risk of suicide occurs" and that "[c]urrent research has demonstrated that delaying treatment of new-onset psychosis is correlated with poorer symptomatic and functional outcomes."

33. Mary stated that from November of 2017 through June of 2018, Jane had been hospitalized four separate times for a period encompassing approximately 75 days. She pointed out that Jane's acute hospitalization cost about $2,200 per day while Jane's residential treatment cost about $500 a day.

34. Mary noted that since Jane had started receiving residential treatment care at Uinta, she had not required acute hospitalization, and that while Jane wasn't yet ready to step down to a lower level of care, she had made significant progress at Uinta and the stability offered there was significantly better than bouncing back and forth from outpatient treatment to acute hospitalization. Mary wrote that "living between her home and a hospital is no way to live."

35. She stated that Jane's treatment providers believed that Jane's treatment at Uinta was medically necessary and that unlike Anthem's reviewers, they had treated Jane in person. Mary reiterated that outpatient treatment had failed in the past and argued that without the treatment provided at Uinta "her chances of long-term success are low."

36. Mary included a copy of Jane's medical records with the appeal. These records showed that while Jane was in treatment she continued to struggle with anxiety, mania, refusing to eat, negative self-image, nightmares, very frequent suicidal ideation with a plan (which on multiple occasions led to her being placed on suicide watch), urges to self-harm, threats of running away from the program, as well as visual, tactile, and auditory hallucinations.

37. In a letter dated March 21, 2019, Anthem upheld the denial of payment for Jane's treatment. The reviewer gave the following justification for the denial:

> The denial issued by Anthem Utilization Management is correct. In the appeal correspondence you explain that there are multiple reject reasons [sic] offered by Anthem claims explanations of benefits. I have only included some of the claims below for the dates of service due to the large number of claims. I have noted these errors on all the claims on file and asked that Anthem claims adjust the reject reason to correctly state that the services are not a covered expense of the patient's plan. Because the services were not denied based on medical necessity, but as not a covered plan benefit, there is no need for medical records. Anthem has complied with ERISA requirements.
>
> According to your January 1, 2018 MarkLogic Corporation Evidence of Coverage on page 154 under the DEFINITIONS heading, it states:
>
> "**Residential treatment center** is an inpatient treatment facility where the patient resides in a modified community environment and follows a comprehensive medical treatment regimen for treatment and rehabilitation of a *mental health condition* or substance abuse. The facility must be licensed to provide psychiatric treatment of *mental health condition* [sic] or substance abuse according to state and local laws and requires a minimum of one *physician* visit per week in the facility. The facility must be fully accredited by the Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA). Wilderness programs are not considered *residential treatment centers*."
>
> Since Unita [sic] Academy RTC, LLC does not meet the definition of Residential Treatment Center (RTC) it is not a covered benefit of your plan.
>
> In response to the concerns with NQTLs (Non-Quantitative Treatment Limitations), NQTLs are not imposed when Anthem Medical Directors are

> making medical necessity determinations, nor by the benefit provided by the health plan, which has been reviewed many times by regulatory and legal oversight bodies. The expectation that a person be treated at the least restrictive level of care that is safe and effective for that member, is true for Behavioral Health as well as Physical Health conditions.
>
> Your mother also mentions in her letter the criteria cited in the denial is not in compliance with the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA). From our understanding, the health plan's determination is not a violation of the Parity Act. We do treat residential treatment centers the same as all intermediate levels of care and we are not holding your residential treatment to a stricter standard. Intermediate care treatment locations have the goal to move the member to treatment on an outpatient basis. Residential treatment is not meant for long term care. However, Unita [sic] Academy RTC does not meet the definition of Residential Treatment Center and this is the reason coverage is not approved. … (emphasis in original)

38. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

39. The denial of benefits for Jane's treatment was a breach of contract and caused Mary to incur medical expenses that should have been paid by the Plan in an amount totaling over $112,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

40. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

41. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation

appeal process. 29 U.S.C. §1133(2).

42. Anthem and the agents of the Plan breached their fiduciary duties to Jane when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Jane's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of Jane's claims.

43. The actions of Anthem and the Plan in failing to provide coverage for Jane's medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

44. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

45. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

46. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

47. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider

specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

48. Specifically, the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or restrictive than the medical necessity criteria the Plan applies to intermediate level medical or surgical benefits.

49. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Jane's treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Anthem exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Anthem excluded coverage of treatment for Jane at Uinta.

50. Specifically, Anthem imposes the requirement that residential treatment centers require "a minimum of one *physician* visit per week in the facility. The facility must be fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA)… " Anthem does not impose this or any similar requirements on intermediate medical or surgical treatment such as the treatment offered in skilled nursing facilities.

51. Anthem asserted in its denial letter that the expectation is "that a person be treated at the least restrictive level of care that is safe and effective for that member." There is no indication that Anthem made any effort to determine whether Jane's residential treatment

13

was safe and effective, instead it appears that Anthem denied coverage based entirely on its assertion that Uinta did not meet its definition of a residential treatment center.

52. The actions of Anthem and the Plan requiring conditions for coverage that do not align with medically necessary standards of care for treatment of mental health and substance use disorders and in requiring accreditation above and beyond the licensing requirements for state law violate MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

53. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Anthem and the Plan evaluated Jane's mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

54. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

55. The violations of MHPAEA by Anthem and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and other Anthem insured and administered plans as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

56. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

    WHEREFORE, the Plaintiffs seek relief as follows:

1.  Judgment in the total amount that is owed for Jane's medically necessary treatment at Uinta under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.  Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.  Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.  For such further relief as the Court deems just and proper.

    DATED this 30th day of January 2020.

                                        By    s/ Brian S. King
                                              Brian S. King
                                              Attorney for Plaintiffs


County of Plaintiffs' Residence:
Fairfax County, Virginia